Final case for argument this morning is 25-1196 Fusong Jinlong Wooden Group v. United States. Good morning. May it please the Court, Brittany Powell on behalf of the Plaintiff Appellants, U.S. Importers of Subject Merchandise, at issue. This appeal concerns whether Commerce's separate rate calculation of 31.63%, which includes the distortive AFA rate, was reasonable in the Sixth Administrative Review of the multi-layer wood flooring anti-dumping duty order. On remand before the CIT, Commerce ultimately weighted averaged the zero rate of one mandatory respondent with the AFA rate of a separate mandatory respondent that was found to be non-cooperative. Although this Court has previously upheld this methodology, the question on appeal is whether the 31.63% separate rate calculation is reasonably reflective of the separate rate company's likely and potential anti-dumping duty margins. But before you get to the merits issue, there are arguments obviously made by the government regarding waiver and forfeiture. So can you address at least the forfeiture point, start there? Yes, Your Honor. Why no comments were made to Commerce, then to the CIT, no filings with the CIT, and some comments that suggested, stated that some of the plaintiffs agreed with the 31% rate. So the government takes the view that the plaintiff appellants waived their argument regarding the inclusion of the AFA in this calculation of the separate rate. Waiver requires an intentional relinquishment. I think you're going to have to start with forfeiture. The waiver argument is not nearly as serious as the forfeiture argument. So put that aside.  So the Court of International Trade issued a second remand opinion, the Court of International Trade remanded to Commerce for consideration the weighted average of the non-cooperating respondent's AFA rate with the 0% calculated rate for the one cooperative respondent. The court expressly reserved for consideration following the second remand results whether the inclusion of the AFA rate. Let me just focus on what at least is front of mind. You absolutely made this argument to the CIT before the remand, and the CIT absolutely clearly said, I'm not deciding it, I'm reserving it. And then it went, then the matter, or a matter, namely the simple versus weighted averaging matter went back to Commerce. And Commerce said, OK, we're going to do the weighted average, and that's all it said. And then comments were filed back in the CIT, and it's those comments that at least I'm focusing on. The government says that you said, affirmatively, we give up everything here. I don't think you did. That's why I'm not persuaded to waiver. But it's what you didn't say that I'm focusing on. And that's, you know, not saying something at the time that you really should have is what would be a forfeiture. And at that point, the question was not whether 42% was distortive, because there was no longer a 42%. There was now a 31%. And you didn't say anything at that point. Judge, there are these reserved questions. They're slightly different factually from what they were, you know, 25% different from 42 down to 31 or something. And there's a legal component. We may or may not be saying that you can never include an adverse inference rate as part of the calculation. Maybe you were saying that. Maybe you weren't. But we still have an important issue that you haven't adjudicated. And it's the fact that you didn't say that that is causing me concern about whether you just forfeited the point. So I understand the concern. And the court's second remand opinion at Appendix 41 and 40, starting at Appendix 40, the court thus remands the issue of the expected method. And the court states that because the remaining issues, i.e. whether Commerce's use of Sino-Maple's AFA rate in the separate rate calculation is aberrational and not reflective of the separate rate company's potential margins and excessive under the Eighth Amendment, are dependent on Commerce's reconsideration of its calculation of the separate rate on  The court is reserving decision on these matters until the results of redetermination are before the court. And so the instructions to Commerce did not go to consideration of including the AFA rate in the calculation of the separate rate and whether it was reasonable or likely reflective of the separate rate company's dumping margins. Because that instruction was not handed down to Commerce, their remand results don't address that specific question either. So the position that we, that the plaintiff appellants forfeited the argument because they didn't raise it at that time is an opposite. The remand results didn't address the issue. Our understanding was that, it depends what you mean by at that time. It's absolutely clear the fact that you didn't raise it to Commerce was not a forfeiture. The question is when Commerce was done with its limited task and you came in as part of the combined plaintiff's crew and wrote a letter saying, we approve of the use of weighted average. That was the only thing Commerce did. The fact that you didn't say, but that doesn't end the matters, exhaust the matters that still need adjudication. And so it seems to me like an orderly way to run this system when there are a lot of different things in play is to have a proponent, particularly when the issue changes, because the number has now changed from 42 down to 31, to say, Judge, we now ask you to decide what you reserved. So, Your Honors, normally the order of operations, as you're aware, is that the parties will comment on what Commerce did on the remand result. When Commerce adopted and issued its remand results to the CIT, it didn't address this question about inclusion of the AFA rate. In responding to Commerce's remand redetermination, we stated that we generally agree that the defendant's final remand results complied with the court's limited instructions by using the weighted average rather than the simple average. So the remand issue, the comments on remand, were limited to that specific issue. The other issue of whether AFA, including the AFA rate and the separate rate, was reasonably reflective of the likely dumping margins was understood to still be reserved. And so... So post the reservation, is there anywhere in the record that you specifically challenged the recalculated 31.63% rate as aberrational? There wasn't an opportunity to do so after Commerce issued the second remand result. The court issued its final judgment and found that the question was moot because of Commerce's decision to calculate a weighted average. So... The answer is no? Yes, Your Honor. So the... The answer is no. You're saying, yes, you agree with me that the answer is no. Yes. So for those reasons, our view is that waiver and forfeiture are not applicable in this case. Should the court find that forfeiture, the parties did forfeit the issue, we're asking the court to exercise its discretion to decide the case on the merits. The comment that perhaps the orderly process or the orderly method of doing this would have been to file comments to remind the court that it reserved this issue that wasn't addressed on remand. Perhaps, Your Honor, that was the right time to do that. Normally though, when the remand results are silent on an issue, you would limit your comments to the issues that were raised on remand. And so that's why it wasn't raised at that time. When you say normally, is there anything... I know practitioners in the world have a whole set of understandings. Are some of those written down? Is there anything in CIT rules or... Is this Judge Eaton? This is before Judge Eaton. Does he have rules? Is there something... Were there prior practices or something, prior cases that say when an issue has been presented, when the matter comes to the trade court and the trade court reserves it, even if there's a remand, the party presenting that issue does or does not have to renew the request for adjudication of it after the remand. I looked for things. I couldn't find it. I am not aware of any requirement either under Judge Eaton's rules or the court's rules requiring a party to renew the issue that was reserved for subsequent consideration following the remand issue. In practice, however, there have been... I'm aware of some cases where parties may have filed a letter or comments to say as a reminder to the court that this issue has been reserved. In other cases, the court has automatically or on its own returned to those reserved issues. And the expectation and understanding was that the court was going to do so in this case. The court did address it, but only by deciding that the issue had been mooted in the final judgment and order. Can I ask you just to talk a little bit about the merits? Suppose we get beyond forfeiture. What do you think that Commerce First or the CIT should do in a situation where all the other parties are being subjected to a rate that's an average, any kind of average, of zero and an adverse inference rate? So plaintiff appellants are not contesting the use of an AFA rate in the calculation of a separate rate. PrimeSource settles that question. Commerce does have a discretion under 19 U.S.C. 6075 D.C. 5, but that discretion ends where distortion begins. And our view is that distortion is demonstrated in this case by an analysis of the historical rates under this order. In five administrative reviews and one investigation, there has only been one calculated rate above zero or de minimis, and that rate was 3.92%. After correction. After correction at the very on appeal. And this is the first case after six different review periods where the rate increased dramatically from 3.92% to 31%. You mentioned, just sorry to interrupt, but you mentioned a minute ago discretion. There's discretion. So is this an abusive discretion? Are we looking at what was done here under an abusive discretion standard? The court, you could consider this to be an abusive discretion. Commerce failed to take into account the historical information and the extent to which it detracted from the separate rate calculation. Both PrimeSource and Boson Tools support the use of historical rates in determining the reasonableness of the separate rate. Commerce didn't give sufficient consideration to those historical rates in determining the usefulness of the separate rate in this administrative review. And we submit that given the historical trends, the likelihood of dumping based on that history, Commerce should revisit that issue on remand. Thank you. Thank you. Good morning, Your Honors. May it please the Court. This Court should dismiss the appeal because Appellants Wago and Gallaher have waived or forfeited both the arguments they raise in this appeal. Specifically, their challenge is to one, Commerce's decision to determine a separate rate that includes the AFA rate of Sino-Maples, one of the inputs, and two, the 31.63% separate rate aberrational figure given historical dumping margins. And alternatively, the Court should affirm should it reach the merits. Can I just ask, why would forfeiture or waiver result in a dismissal as opposed to an affirmance? With forfeiture, it's a procedural mechanism that this Court has discretion to use. And that would not be reaching the merits, which would be an affirmative agreement with the lower court. I understand the difference between waiver and forfeiture, but I would have thought that forfeiture, and we're not in veterans' court land where the rules about our jurisdiction are unique. We have an appeal from a judgment of the Court of International Trade. The appellant says, here's something that went wrong. You say you didn't make that argument below, you forfeited, you waived it. In the ordinary course, we would affirm due to forfeiture. I don't understand this dismissal business. I think the end result would be the same. And so procedurally. You didn't ask for dismissal in the brief. Like, I totally agree with Judge Toronto. I was just rechecking by looking at what was in the briefing. And it was, you asked to affirm. I'm not sure why you're making this dismissal argument. I'm just adding on to, I think, what Judge Toronto was saying. So I think the Court could consider that potentially forfeited for dismissal and could affirm. I think the end result is the same. My understanding is to be more procedurally precise to ask for dismissal. But at the end of the day, I'm happy to argue for affirmance. And so on the forfeiture question, to me, as you could tell from the earlier discussion, this comes down to whether the other side had an obligation, which it didn't, but an obligation to say, Judge Eaton, there's these reserved questions. We maintain our position about those questions. When the matter came back to the CIT after the Commerce Remand decision, adopting weighted averaging instead of simple. Why did, it seems to me, why did they have that obligation? So I think, as my colleague talked about earlier, there's this different rate percentage. And so the issue preserved in their MJAR was with respect to a 40-some rate. We're now at a 30-some rate. So that's one distinction. MJAR? A motion for judgment of the administrative record. Thank you. The briefing that was done before the trade court, prior to the remands. So that's one issue that was talked about. But I think one thing that was missing from the discussion prior is also the methodology. And so the methodology that was used prior to the remand was a simple average of the two mandatory respondents that get you that 40-some percent rate, 85 and 0. The CIT said, well, you have evidence on the record to use the expected method, which this court's precedent and the Uruguay 1994 statute makes clear. That is expected. And if commerce departs from what's expected, it needs to just— That's an argument that the petitioners had made to the CIT? Or was that sort of sua sponte raised by the CIT? I don't recall specifically. There were a lot of parties below which party made that particular argument. But that was a particular challenge that was made. And it ultimately resulted in a lower rate. That was a challenge made. But that challenge was separate and distinct. I'm sorry to interrupt. I'm just part of Judge Duranto's question. That challenge was separate and distinct from the other challenge. I think they're interwoven because the expected method explicitly acknowledges that you take the two mandatory respondents. You start out with the 0. You start with the 85 percent. And you weight average them. And because the one that was 0 was more heavily weighted, that's why you had 31 percent as opposed to down the middle, right? And so that's the method. And you get that percentage as a result of applying that expected method. And so if you say in your comments, we agree with the expected method. We don't want Commerce to use a different kind of methodology beyond the normal expected traditional method, they're stuck with the 31 percent. They don't offer any reason to go beyond 31 percent if they agree with the expected method, which is what we understood them to be doing. And so they're not challenging the— But you heard your friend's answer to the question that there was an argument, an issue pending before the CIT. And the CIT said in writing that we are reserving a determination on that issue. So it's not like there's nothing to suggest that they would have to raise it again. Right? So I think what the CIT said is you can continue to use a non-traditional, non-normal, non-expected method, or you can use the expected method. But if you use a different, non-traditional method, you need to support that with substantial evidence. The prior way you did it by a simple average, which is not the expected method, was unsupported by substantial evidence. If they had an alternative that would result in a third method, they had an obligation to say we disagree with you using the expected method. And whether one considers it a waiver or a forfeiture, they said we agree that the calculation of the expected method, and we don't suggest any alternative either before commerce or in two opportunities before the trade court. And so what we have here is an expected method where it results in 31.63 percent. They don't disagree with that calculation. And that's what the method is. And they seem to be suggesting, well, because we earlier suggested when the rate was a lot higher that these other things, you know, may be in play, they simply did not preserve that by expressing agreement with the expected method and failing to raise any challenge, both to the number and the methodology. I am hearing things that do give me concerns about whether or not there was forfeiture here. Just on the merits in particular, can you respond to the statements opposing counsel made in terms of saying why this 31.63 rate is just way too high? She pointed to a series of things, I think it was about five or six things that would have had the rate much closer to zero percent. Can you respond directly to that? Sure. And as I mentioned earlier, I think the issue of what method to choose is related to that ultimate rate. And if this court finds that the expected method was rational, that's what the percentage was, right? And so the argument of using that methodology, I submit, was supported by substantial evidence. With respect to the rate specifically divorced from the particular methodology used, I think this Court's precedent, Albemarle, is particularly persuasive there, which makes clear that in an investigation, you look at the mandatory respondents, and they are assumed to be representative of the separate rate companies. And indeed, under the expected method, the default is to weight average the mandatory respondents and assume that they're representative unless there's record evidence to suggest otherwise. And there was none. What I understand your friend to have said is that all she was asking was for Congress to consider and look at the historical record, et cetera, and that suggesting that that's maybe not the normal practice, but that is a practice that has been used elsewhere. Am I wrong? That's what I understand their arguments to be. And just, I'm sorry, and even in the terms that you recited, you can look at, you can assume that the examined parties are representative unless there's evidence to the contrary. One way to, I think, make the point on the other side is there was five or six years of exactly that evidence that they were not representative because we were always right around zero until suddenly this one misbehaved and got, because it was misbehaving, i.e. being non-cooperative, a really high rate. That doesn't indicate that it's, that disparity would suggest that actually this single outlier, one-time non-cooperator is not representative and Congress needed to address that. So the AFA rate for the mandatory respondent was based off of the highest transaction-specific margin on the record for the particular administrative review. So it did not carry over from prior years. It was based off of the particular year, which this court has held, can be the basis, and in fact, is more likely to be the basis because the entire logic of having a different year is that things change. You have different respondents. The largest importer of wood could be different 10 years ago than it is today. And Commerce has a record, and it has two of the largest, which it chose. And in prior years, the— But did Commerce address a contention that the bad actor, the non-cooperators, single high transaction was not representative of the rest of us this year? And you can, and one reason you might think that is, look what everybody actually was doing for the last five or six years, namely roughly zero margins. And the answer may be, Commerce might be able to say, well, actually, we've considered that evidence. We don't think it overcomes the general idea that this one big investigated or reviewed respondent is representative, but at least we've considered it. And I think, did Commerce consider it at all? So what Commerce did is they said that there was not enough evidence to reach a conclusion that that larger, the Sino-Maple, was not representative. There's a presumption they are representative, and there needs to be evidence to say, hey, this separate rate company is somehow different than either the zero— There's also no indication it's more like the zero percent than the 85 percent. It's pure speculation based off of assumptions about what may have happened in different years. And so Commerce is saying they have not met their burden to show we're going to depart from the expected method that this court's precedent and the statute makes clear we should apply because we are somehow different. And they haven't met that obligation to show that they are more like the zero percent than the 85 percent, other than speculation about what might have been occurring in prior reviews. And again— Is there evidence in the record to support the 31.63 percent rate as reasonable as applied to the consolidated plaintiffs? As I mentioned earlier, the use of the expected method is presumptively reasonable, and you need reasons to depart from that. And there's no dispute about that. Anything beyond your statements regarding the use of the expected method makes it reasonable? So there's no sales data for these separate rate companies. These separate rate companies, because of Commerce's resources, only two were chosen. There's no dispute about those two. And there's no sales data. So again, this gets to the whole speculation point. They are arguing they're more like the zero percent, but there's no evidence for that either. There's no more evidence that they're more like the zero than the 85. Is there a record site for one of—I don't know what these are called, but I mean, the argument you just made that Commerce looked at the evidence and said you haven't met your burden, blah, blah, blah. Is that in writing? Is that the argument you made to the CIT? The argument regarding economic reality where we cite NANIA, we make that in our brief. I don't have an explicit record site to Commerce, but I believe that is— they have language saying that we see no reason to depart from the expected— Is that in the July 29, 2019 long contract? I think there's a reference to not departing from the mandatory respondents. I don't have a specific site as I stand here right now. I mean, you say that Commerce, at some point, considered the argument they were making about why they should use something else and just said it wasn't sufficient for a certain number of reasons. They didn't have enough reasons to go beyond their expected method. They did not say—and I believe we argued before that the simple average was the expected method and the CIT shot that argument down. But we were in this universe of using the expected method of taking these two data points, the 0 and 85 percent, and we were trying to figure out, based off of that, what do we apply to everybody else? And Commerce said you don't have to depart from that universe where you're relying on the 0 and 85 and trying to figure out what that separate rate is. Is this somewhere around page 180 of the appendix? 177 to 181. That looks about where the discussion would be. So again, as I realize my time is short here, as I mentioned before, the expected method was supported by substantial evidence. There's a forfeiture issue. And if the court sustains the expected method, it should sustain Commerce's determination also the rate is not aberration. Can I ask you the same CIT practice question that I asked your friend on the other side? Is there something that you are aware of about CIT practice that addresses this question of renewing previous arguments that had been reserved by the court for decision when the court remanded for Commerce to address a particular issue different from the ones that were reserved, that there's an obligation to renew them or there sometimes is or there never is or anything like that? I think as applied here, it depends on how one construes what was being reserved. I think what the court essentially found in moot and it won because the rate changed and also because of what they submitted that they were fine. And I think one can think of an example of the rate goes from 42 to 31. Maybe it would have gone to 10. Maybe it would have gone to 5. Maybe it would have gone to 1. At some point, it's reasonable to suspect that they would have said, OK, that's good enough. We'll take that. And the court had no reason to suspect that they were not satisfied with the 31. And so it saw, OK, because of what I see, this is moot now or it hasn't been preserved, however one wants to frame the argument. But I think in this very context— Do you understand? Because I think one almost has to understand mootness here to be dependent on the forfeiture. That is to be dependent on the fact that the relevant facts to the only argument previously made have changed. So those previous arguments were no longer in the case. New arguments, though extremely close kin to the old argument, would have to be made. Because otherwise, it's clearly not moot. And I think the CIT, I don't know if it used the exact word forfeiture, but they do mention the opportunities. They reached out to plaintiffs. The clerk reached out. So I think that's what animates that logic that the CIT had. I'm happy to answer any other questions. Thank you. You have rebuttal time. We'll add an additional minute because we went over with the government. So why don't you give four minutes if you need it. Thank you, Your Honors. I'll be brief. I do want to clarify. The defendant's or the government's position was that the plaintiff appellate's agreed with the second remand results. And I draw your attention to Appendix 568, where the plaintiff appellate submitted comments before the CIT. I agree with you. You didn't say you agree. So moving on, the government's position here would eliminate the reasonable limitation under the expected method. The government repeatedly says that commerce used the expected method, but that's not the end of the inquiry. But the government seems to impose a heightened sense of reasonableness based on the expected method being used, where the weighted average was calculated and the two mandatory respondents represented the largest exporters from China. Respondent selection doesn't take care of the reasonableness question. It doesn't automatically mean that the selected exporters' rates are reasonably reflective of the separate rate, particularly where one rate is inclusive, is based entirely on AFA. Congress anticipated the scenario where the expected method might not reasonably reflect the separate rate and allowed for departure from the expected method. And we submit that that should have been done here. I also refer to Changzhou, Howd, Floring, and Dicta. This court said that a separate rate company's decision to respond to questionnaires might suggest that they were actually more similar to the calculated, to the mandatory respondents that participated than the respondents that did not participate. So the government's contention that separate rate companies are represented by AFA companies, by the non-responding or non-cooperative respondents, more than or equal to the responding and cooperative companies, is an opposite. And we request that the court give that consideration. Do you agree that Commerce, right around page 180 of the appendix, this is, I think, the July 2019 Commerce, one of the official memos, kind of addressed this and said, we just don't see good enough reason to distinguish you all from SINO or something. So appendix 181 appears to be the final results of the administrative review. And so Commerce didn't address this question after the appeal was filed. Commerce addressed it at the administrative review level to say that, essentially, in on the expected method being reasonable as it is the methodology that normally would apply unless there are sufficient justifications to depart from it. So that is the extent of its addressing. But at what point did you present, I assume you made a case to them as to why they should depart from the norm based on the kinds of stuff you've been telling us today? Was that after the review or before the review? The issues were initially raised before the final results. And then, again, on appeal in our 56.2 motion for judgment on the agency record, the first remand didn't address the question of the separate rate calculation because it addressed the application of AFA to the one mandatory result. But all I was interested in is before the results that we're talking about here, that you had made your case, your argument as to why there should be a departure. These arguments were made prior to the final results of the administrative review, which is why they addressed it at that time. But at no other point in time did they address that question. For these reasons, we ask that this court reverse the CIT's decision and find that the separate rate up, including the AFA rate, was not supported by substantial evidence on the record. Thank you.